IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 10, 2006

## A.T. PRUITT v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-28554      Chris Craft, Judge**

_____

### No. W2005-01415-CCA-R3-PC  - Filed February 8, 2006

_____

The petitioner, A.T. Pruitt, appeals the denial of his petition for post-conviction relief, arguing his trial counsel was ineffective in communicating to him or preparing him for trial, which resulted in him entering guilty pleas that were neither knowing or voluntary.  Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Vicki M. Carriker, Memphis, Tennessee, for the appellant, A.T. Pruitt.

Paul G. Summers, Attorney General and Reporter; Seth P. Kestner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Michelle Parks, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

**Procedural History**

On July 7, 2003, the petitioner pled guilty to two counts of aggravated rape and one count each of especially aggravated robbery, especially aggravated burglary, and especially aggravated kidnapping.  The facts surrounding these offenses, as taken from the trial court's order denying the post-conviction relief petition, are as follows:

Two separate offenses are the subject of this guilty plea, the June 21, 2000 aggravated rape of victim [J.N.][1] [hereinafter referred to as "the [J.N.] case"] and the January 29, 2001 aggravated rape, especially aggravated burglary, especially aggravated robbery and especially aggravated kidnapping of [R.S.] ["the [R.S.] case"]. From the technical record, petitioner was arrested on the [J.N.] case on July 2, 2000, at age 15, and was transferred by Juvenile Court for prosecution and sentencing as an adult to Criminal Court on August 30, 2000. [J.N.] stated to police that she was out in her back yard doing some gardening when an individual came up to her with a knife, forced her to the ground and raped her. When petitioner's sister brought him to the Memphis Police Department homicide office eleven days later, he gave a signed, written statement . . . to the police admitting that he saw [J.N.] go into her back yard, and jumped her fence with a knife. He had her in a headlock with the knife and then ran when a man came into the back yard. He stated he did not know how her clothes got pulled off, but he denied raping her. When asked "Are you willing to submit to DNA testing?" he replied "Yes sir." A copy of this statement, which he admitted signing during his testimony in the motion to suppress the statement, is filed in the technical record of the [J.N.] indictment, . . ., after having been entered as an exhibit in the hearing on the motion. No potential DNA evidence was recovered in the [J.N.] case. [J.N.] identified the [petitioner] in a photo spread as the perpetrator. On December 15, 2000, he made a $20,000 bond on that case and was released from the Shelby County jail. Six weeks after petitioner made bond for the alleged aggravated rape of [J.N.], [R.S.] reported her aggravated rape, burglary, robbery and kidnapping . . . . She stated to police that the perpetrator came to her door, indicated to her that he was a friend of her son, and asked if he was there. She responded that he wasn't. He later came back and knocked again, and when she answered, he forced his way in. She was severely beaten and raped. He took property from her home, along with the keys to her vehicle. He returned again and forced her to show him how to drive the vehicle, leaving her door open, so that her 2 year old child left and was later found with a neighbor. He dropped her off in an unfamiliar neighborhood. He was arrested for that offense January 31, 2001, at age 16, and gave a statement to the police that he was present at [R.S's] house, but only took a video game, and committed no act of rape. He was automatically transferred to General Session Court to be treated as an adult in Shelby County General Sessions Court, having previously been transferred by juvenile court on the prior aggravated rape for which he had been on bond, pursuant to Tenn. Code Ann. § 37-1-134(c). Although a Ms. Hobbs, a Juvenile Defender, represented him in Juvenile Court on the [J.N.] case, [trial counsel], an attorney with the Shelby County Public Defender's office and a member of their Violent Crimes vertical defense unit, was assigned to represent him on the [R.S.] case after his new arrest. She also represented him at his preliminary hearing, and on both the [R.S.] and [J.N.] cases after they were both indicted. Although [R.S.] identified petitioner at his preliminary hearing, she

---

[1] It is the policy of this court to refer to victims of sexual offenses by their initials.

apparently made an earlier identification in a photo lineup of another person. A DNA comparison was made of semen detected in the [R.S.] case and the probability of its being from anyone other than petitioner was found to exceed the world population.

The petitioner received fifteen-year sentences for each of the aggravated rape, especially aggravated robbery, and especially aggravated kidnapping convictions and an eight-year sentence for the especially aggravated burglary. The aggravated rape sentence for J.N.'s case was run consecutively to all the other sentences because the petitioner had been on bond for that charge when he committed the other offenses. This resulted in the petitioner receiving a total effective sentence of thirty years, to be served at 100% as a violent offender, in the Department of Correction.

On June 10, 2004, the petitioner, *pro se*, filed for post-conviction relief. Post-conviction counsel was appointed and an amended petition was filed which argued, among other numerous things, that the petitioner's guilty pleas were involuntary due to ineffective assistance of counsel. The petitioner claimed that trial counsel did not adequately communicate with him concerning the investigation of his case, the penalties he was facing, or the results of his DNA test. He also contended that trial counsel failed to interview witnesses and failed to file pretrial motions to ascertain his competency to stand trial and suppress a complaining witness's identification of him.

### Post-Conviction Hearing

Trial counsel testified that she met with the petitioner both in the courtroom and "in the jail as well." She explained that after she "got all the discovery from the State" for both rape cases, she provided the petitioner with a copy.[2] Although the petitioner already had a psychological evaluation while in juvenile court,[3] trial counsel had another one done, which showed the petitioner was competent.[4] Asked about the DNA test results, trial counsel said she advised the petitioner that he matched the DNA test results from the R.S. case but not the J.N. case. Asked if she interviewed or subpoenaed any other witnesses, trial counsel explained she did not because the petitioner "could not give [her] any witnesses to call."[5] Trial counsel said she was prepared to go to trial on the J.N. case when the petitioner decided to plead guilty in both the J.N. and R.S. cases. She said she "told him that [the J.N.] case was a little bit better than the [R.S.] case because there was no DNA" in the

[2] Trial counsel also provided the petitioner with additional copies of the discovery after he had his original copies taken away from him.

[3] The petitioner's juvenile public defender gave trial counsel a copy of all "her information from Juvenile Court which also included a psych report." Trial counsel gave the petitioner copies of this information as well.

[4] Trial counsel said that the petitioner never told her he had schizophrenia and that although the mental evaluation showed the petitioner "had an IQ of 69," it did not show he had any type of psychosis. She further explained that "during [her] course of visitations and working with him, [she] did not detect anything wrong either."

[5] Trial counsel further elaborated that "[a]ccording to [the petitioner's] statement there were two other males who supposedly did [the R.S. case] with him, [she] kept asking him about it, he could not tell [her] any other names, not tell [her] any other names, so [she] did not have anything to investigate on that."

J.N. case. Trial counsel testified that from the first time she met with the petitioner, she explained to him the amount of time he could be sentenced to and that he was facing "a hundred percent charges." She also said that she went over the entire plea agreement with the petitioner and was "kind of surprised . . . when he decided that he wanted to go ahead on and plead guilty."

The petitioner testified that although he "got discovery" from trial counsel it was only "half [his] discovery" because he never received the results of his DNA tests and said trial counsel never discussed the results with him. He also made the following various claims about trial counsel: she failed to visit him in jail, failed to tell him the results of his mental evaluation or the results of his motion to suppress hearing, refused to tell him what type of defense they were going forward with,[6] had the J.N. and R.S. rape cases "mixed up," and did not explain his plea agreement or the sentencing range he was facing. He said that he pled guilty only because he felt he had no help from trial counsel.

On cross-examination, the petitioner acknowledged that trial counsel did visit him "outside the courtroom." He also initially claimed that he was not present during his suppression hearing but then acknowledged testifying at the hearing. He also acknowledged that the trial court discussed his guilty plea with him and told him that he would "be serving as a violent one-hundred percent offender." Although he felt he had no help from trial counsel, the petitioner acknowledged not telling the trial court during his plea proceeding or asking any questions. The petitioner claimed that if trial counsel had told him the results of the DNA test in the R.S. case, which showed he was the donor of the semen found, he would not have pled guilty but, instead, would have gone to trial "[b]ecause [he] knew what was the real reason on [his] case and how [his] case really went about." Asked to explain, the petitioner claimed that he did not rape R.S., but instead engaged in consensual sex "with her and her daughter to be honest." He acknowledged he never told trial counsel that he supposedly had consensual sex with the rape victim.

On May 23, 2005, the post-conviction court entered a detailed written order denying the petition for post-conviction relief. The court accredited trial counsel's testimony while finding the petitioner's testimony "lacked any indicia of credibility." Accordingly, the post-conviction court concluded that the petitioner had "not shown any deficient performance on the part of his attorney by clear and convincing evidence."

## ANALYSIS

### Ineffective Assistance of Counsel

On appeal, the petitioner argues that his guilty pleas were involuntary because trial counsel did not provide effective assistance. He contends that counsel was ineffective because she "failed to adequately communicate with [him] concerning the investigation of his case" and "failed to

---

[6]The petitioner claimed that when he "asked [trial counsel] what type defense she was going to use in [his] case . . . she told [him] it was -- this was for her to know only."

adequately communicate the minimum and maximum penalties of each charge to which he plead [sic] guilty." The State argues that "the record demonstrates that trial counsel adequately represented the petitioner and communicated to the petitioner the sentence range and release eligibility date." We agree with the State.

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.... No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

By statute in Tennessee, the petitioner at a post-conviction relief hearing has the burden of proving the allegations of fact by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). A petition based on ineffective assistance of counsel is a single ground for relief, therefore all factual allegations must be presented in one claim. See Tenn. Code Ann. § 40-30-206(d).

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999), "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

In denying the post-conviction petition, the post-conviction court made the following findings of facts:

> An analysis of the proof at the hearing must start with this Court's finding on the record at the conclusion of the hearing that petitioner's testimony at the hearing on this petition lacked any indicia of credibility. His demeanor on the stand and his constantly changing testimony made it clearly apparent to this Court, if not to all present in the courtroom, that petitioner was making up much of his testimony on the spot as he was being questioned. While making sweeping, vague statements as to the reasoning behind his thinking, his theories simply made no sense. He refused to delineate any concrete acts his attorney should have taken that would have reasonably made a difference in his decision to plead guilty. As examples of this impeached testimony, he complained that his attorney never heard a motion to suppress his statement in the [J.N.] case, but when confronted with the fact that the motion had been heard, he stated he was not present at the hearing. He then changed his testimony when confronted with the fact that he testified as a witness during the

hearing. He claimed he had never been told the results of any DNA test, and insisted that if he had known he was pointed out by the DNA evidence as the perpetrator, that he would not have plead[ed] guilty, but would have insisted on going to trial, which makes no sense. He could not explain why an assumed absence of a DNA match would have induced him to plead guilty. He insisted that his attorney had never visited him in the jail, but admitted later under cross-examination that his attorney gave him another copy of his discovery during a jail visit. He stated at the hearing, apparently for the first time ever, that he had had consensual sex with [R.S.], and, incredibly, also with her daughter, but apparently never thought to bring this up in the conversations he had with his attorney in the two and one-half years the [R.S.] case had been pending, and he was insisting [trial counsel] did not keep him informed as to the progress of the investigation. His testimony was simply unbelievable. His attorney's testimony, on the other hand, was consistent, unimpeached, and made both legal and logical sense.

We agree wholeheartedly with these findings and with the post-conviction court's characterization of the petitioner's testimony as lacking "any indicia of credibility."

In addition, the post-conviction court correctly noted in its conclusions of law that: All complaints of petitioner concerning lack of investigation, witness interviews, tests and motion practice were completely unsupported by any proof of anything done which prejudiced petitioner . . . . His attorney acted as her knowledge, experience, and talents best permitted and then moved ahead. "When [s]he does this, that is all any lawyer can do, and the client has no right to complain of the absence of a miracle." State v. Blackmon, 78 S.W.3d 322, 329 (Tenn. Crim. App., 2001), citing Williams v. Beto, 354 F.2d 698, 706 (5th Cir. 1965).

In sum, there is no evidence that counsel was deficient in her representation or that the petitioner would not have pled guilty were it not for counsel's alleged deficiencies. We conclude, therefore, that the petitioner is not entitled to post-conviction relief on the basis of his claim of ineffective assistance of counsel.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's dismissal of the petition.

_____
ALAN E. GLENN, JUDGE